**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TODD R. SNYDER, as Plan Administrator
for the Terraform Labs Pte. Ltd., et al., each
Post-Effective Date Debtor, and the Wind
Down Trust,

              Plaintiff,

      v.

JANE STREET GROUP, LLC; JANE
STREET CAPITAL, LLC; BRYCE
PRATT; ROBERT GRANIERI; and
MICHAEL HUANG,

              Defendants.

Case No. 1:26-cv-01536-DEH

**ORAL ARGUMENT REQUESTED**

## THE PLAN ADMINISTRATOR'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ...........................................................................................................1

FACTUAL BACKGROUND ............................................................................................2

LEGAL STANDARD.......................................................................................................9

ARGUMENT .................................................................................................................10

I.      THE COMPLAINT STATES CLAIMS ON BEHALF OF INDIVIDUAL
        VICTIMS. .........................................................................................................10

        A.      Insider Trading...................................................................................10

        B.      Control Person Claims.......................................................................23

        C.      Unjust Enrichment.............................................................................23

II.     THE COMPLAINT STATES CLAIMS ON BEHALF OF TERRAFORM. .....................24

        A.      Insider Trading...................................................................................24

        B.      Control Person Claims.......................................................................28

        C.      Unjust Enrichment.............................................................................28

III.    THERE IS NO EXTRATERRITORIALITY PROBLEM...................................................29

CONCLUSION..............................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*60223 Tr. v. Goldman, Sachs & Co.*,
540 F.Supp.2d 449 (S.D.N.Y. 2007).......................................................................................... 19

*Absolute Activist Value Master Fund v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)........................................................................................................ 29

*Acquard v. Big Heart Pet Brands*,
2020 WL 12904361 (W.D.N.Y. Nov. 30, 2020)....................................................................... 24

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
529 F.Supp.3d 111 (S.D.N.Y. 2021)................................................................................... 11, 23

*In re Am. Bus. Computs. Corp. Sec.*,
1994 WL 848690 (S.D.N.Y. Feb. 24, 1994).............................................................................. 19

*In re Archegos 20A Litig.*,
156 F.4th 108 (2d Cir. 2025) ............................................................................................. *passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................................... 9, 10

*Bateman Eichler, Hill Richards v. Berner*,
472 U.S. 299 (1985)............................................................................................................. 27, 28

*In re Bernard L. Madoff Inv. Sec.*,
721 F.3d 54 (2d Cir. 2013)........................................................................................................ 27

*Combs v. SafeMoon*,
2024 WL 1347409 (D. Utah Mar. 29, 2024) ............................................................................ 30

*CompuDyne v. Shane*,
453 F.Supp.2d 807 (S.D.N.Y. 2006)......................................................................................... 25

*Diamond v. Oreamuno*,
248 N.E.2d 910 (N.Y. 1969)..................................................................................................... 28

*Dirks v. SEC*,
463 U.S. 646 (1983)............................................................................................................. 12, 13

*Elkind v. Liggett & Myers*,
635 F.2d 156 (2d Cir. 1980) ..................................................................................................... 18

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994)........................................................................................................ 18

ii

*Gordon v. Sonar Cap. Mgmt.*,
   962 F.Supp.2d 525 (S.D.N.Y. 2013) ..................................................................15

*In re Grumman Olson Indus.*,
   329 B.R. 411 (S.D.N.Y. 2005) ..........................................................................27

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
   Scot. Grp.*,
   783 F.3d 383 (2d Cir. 2015) ..............................................................................15

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*,
   32 F.3d 697 (2d Cir. 1994)..................................................................................11

*Kaplan v. S.A.C. Cap. Advisors*,
   40 F.Supp.3d 332 (S.D.N.Y. 2014) ....................................................................18

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ...............................................................................17

*Mason v. Reed's*,
   515 F.Supp.3d 135 (S.D.N.Y. 2021)...................................................................24

*Messieh v. HDR Glob. Trading*,
   2024 WL 1436755 (S.D.N.Y. Apr. 3, 2024) .......................................................30

*Morrison v. Nat'l Austl. Bank*,
   561 U.S. 247 (2010) ............................................................................................29

*Nuss v. Sabad*,
   2016 WL 4098606 (N.D.N.Y. July 28, 2016) .....................................................24

*Oklahoma Firefighters Pension & Ret. Sys. v. Musk*,
   779 F.Supp.3d 396 (S.D.N.Y. 2025).............................................................10, 14

*In re Oxford Health Plans, Inc., Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999).........................................................................16

*Palomino Master v. Credit Suisse Grp.*,
   2026 WL 848394 (S.D.N.Y. Mar. 26, 2026)........................................................30

*Pinter v. Dahl*,
   486 U.S. 622 (1988) ............................................................................................27

*SEC v. Brewer*,
   2025 WL 1548765 (S.D.N.Y. May 30, 2025) .................................................12, 13

*SEC v. Carroll*,
   9 F.Supp.3d 761 (W.D. Ky. 2014) ..................................................................12, 14

*SEC v. Conradt*,
    947 F.Supp.2d 406 (S.D.N.Y. 2013)......................................................................................21

*SEC v. Lund*,
    570 F.Supp. 1397 (C.D. Cal. 1983)......................................................................................21

*SEC v. Lyon*,
    605 F.Supp.2d 531 (S.D.N.Y. 2009)....................................................................................20

*SEC v. McGee*,
    895 F.Supp.2d 669 (E.D. Pa. 2012)......................................................................................21

*SEC v. Obus*,
    693 F.3d 276 (2d Cir. 2012) .................................................................................................12

*SEC v. One or More Unknown Traders in Securities of Onyx Pharms., Inc.*,
    296 F.R.D. 241 (S.D.N.Y. 2013)............................................................................ 10, 14, 15

*SEC v. Suman*,
    684 F.Supp.2d 378 (S.D.N.Y. 2010)....................................................................................21

*SEC v. Terraform Labs Pte. Ltd.*,
    708 F.Supp.3d 450 (S.D.N.Y. 2023)...................................................................................2, 3

*SEC v. Terraform Labs Pte Ltd.*,
    No. 23-cv-1346 (S.D.N.Y. Apr. 5, 2024)................................................................................3

*SEC v. Tome*,
    638 F.Supp. 596 (S.D.N.Y. 1986) .............................................................................. 11, 13, 22

*SEC v. Warde*,
    151 F.3d 42 (2d Cir. 1998)..............................................................................................12, 15

*SEC v. Watson*,
    659 F.Supp.3d 409 (S.D.N.Y. 2023)...............................................................................10, 12

*SEC v. Wey*,
    246 F.Supp.3d 894 (S.D.N.Y. 2017).....................................................................................14

*Shearson Lehman Hutton v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991) .................................................................................................26

*Sripetch v. SEC*,
    2026 WL 1593329 (U.S. June 4, 2026) ................................................................................29

*Steginsky v. Xcelera Inc.*,
    741 F.3d 365 (2d Cir. 2014) .................................................................................................16

*In re Tai Mo Shan Ltd.*, Securities Act Release No. 11349,
  Admin. Proc. File No. 3-22382 (Dec. 20, 2024) ......................................................... 3

*In re Take-Two Interactive Sec. Litig.*,
  551 F.Supp.2d 247 (S.D.N.Y. 2008) ....................................................................... 14

*In re Terraform Labs Pte. Ltd. et al.*,
  No. 24-10070 (Bankr. D. Del.) ................................................................................. 9

*Trend & Style Asia HK v. Pac. Worldwide*,
  2015 WL 4190746 (S.D.N.Y. July 10, 2015) ........................................................... 24

*Trott v. Deutsche Bank*,
  2025 WL 2783555 (S.D.N.Y. Sept. 30, 2025) .......................................................... 26

*Tsutsui v. Barasch*,
  892 N.Y.S.2d 400 (App. Div. 2009) ........................................................................ 29

*United States v. Chow*,
  993 F.3d 125 (2d Cir. 2021) ............................................................................. 13, 21

*United States v. Falcone*,
  257 F.3d 226 (2d Cir. 2001) ....................................................................... 12, 20, 21

*United States v. Kosinski*,
  976 F.3d 135 (2d Cir. 2020) ....................................................................... 13, 20, 21

*United States v. Kwon*,
  No. 23-cr-151 (S.D.N.Y. Dec. 12, 2025) ................................................................... 3

*United States v. Martoma*,
  894 F.3d 64 (2d Cir. 2017) .................................................................................... 12

*United States v. McPhail*,
  831 F.3d 1 (1st Cir. 2016) ................................................................................. 12, 21

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ......................................................................................... 11, 25

*United States v. Teicher*,
  987 F.2d 112 (2d Cir. 1993) .................................................................................. 16

*Veleron Holding, B.V. v. Morgan Stanley*,
  117 F.Supp.3d 404 (S.D.N.Y. 2015) .................................................................. *passim*

*Veleron Holding, B.V. v. Morgan Stanley*,
  694 F. App'x 858 (2d Cir. 2017) ....................................................................... 12, 16

v

*Williams v. Binance*,
 96 F.4th 129 (2d Cir. 2024) .................................................................................29, 30

**Statutes**

15 U.S.C. § 78j............................................................................................................ 10

15 U.S.C. § 78t............................................................................................................ 23

15 U.S.C. § 78t-1 ............................................................................................. 11, 16, 19

**Regulations**

17 C.F.R. § 240.10b-5 .................................................................................................. 10

17 C.F.R. § 240.10b5-1 ...........................................................................................10, 16

17 C.F.R. § 240.10b5-2 .................................................................................................21

**Other Authorities**

Brief of Reporter and Advisers to Restatement (Third) of Restitution and Unjust
 Enrichment, as Amici Curiae in Support of Respondent, *First Am. Fin. Corp.
 v. Edwards*, 567 U.S. 756 (2012) (No. 10-708).........................................................25

Dkt. 56, *Snyder v. Jump Trading, LLC*, No. 25-cv-15414 (N.D. Ill. May 1, 2026).........................3

H.R. Rep. No. 100-910 (1988)............................................................................. 11, 21, 26

Restatement (Third) of Restitution and Unjust Enrichment § 1 (A.L.I. 2011)..............................28

U.S. Sec. & Exch. Comm'n, *Staff Summary Report on Examinations of
 Information Barriers: Broker-Dealer Practices Under Section 15(g) of the
 Securities Act of 1934* (2012),
 https://www.sec.gov/about/offices/ocie/informationbarriers.pdf...........................................13

**INTRODUCTION**

Jane Street generates billions of dollars in trading revenue every year. Not all that revenue is the product of superior skill; some of it comes from cheating. This case is an insider-trading case that happens to arise in the context of a larger, separate fraud. Terraform issued crypto tokens called UST and LUNA, fraudulently touted their merits, and ultimately collapsed when the market realized that Terraform's core value proposition was false. Before Terraform's collapse, Jane Street invested in UST and LUNA and cultivated what one Jane Street employee referred to as an "informational advantage" by illicitly pumping Terraform insiders for non-public information. Later, as Terraform was collapsing, Jane Street injected itself into discussions about a bail-out but then used the inside information it learned to trade against Terraform and hasten its demise.

This is not a case of a single tip and a single trade. Jane Street's conduct reflects a brazen, months-long effort to cheat the market in ways that ensured Jane Street would always win. Financial institutions have entire departments dedicated to ensuring that what Jane Street did here doesn't happen. Why? It is obviously illegal. Financial institutions are not allowed to gain inside information—by grooming insiders or by feigning interest in a financing round or by any other means—and then turn around and pass that inside information directly to their traders taking long and short positions in the public markets. Jane Street's own compliance department knew this all smelled bad but apparently hadn't "start[ed] thinking about how MNPI might exist in crypto." That was better than what one of Jane Street's traders believed: "mnpi didn't really exist in crypto."

The bad news for Jane Street is that insider trading does "exist in crypto," and the rules apply to Jane Street, too. By pumping insiders for information to pass along to its traders, Jane Street avoided nearly $200 million in losses by front-running Terraform's collapse and profited over $100 million by taking perfectly timed short positions as other market participants lost everything. This lawsuit is how Jane Street will be held accountable to individuals who traded in

the market alongside a cheater.  It is also how Terraform will hold Jane Street accountable for misappropriating its inside information and trading in ways that accelerated Terraform's collapse.

FACTUAL BACKGROUND

**1.    Terraform Creates and Touts UST as an Algorithmic Stablecoin**

Terraform launched in 2018 and, in 2019, issued its native token LUNA.  Compl. ¶¶ 34-35.  LUNA functioned like equity, rising and falling in value as investors saw value in (or wanted to speculate on) Terraform's business.  *SEC v. Terraform Labs Pte. Ltd.*, 708 F.Supp.3d 450, 473 (S.D.N.Y. 2023).  Terraform later issued TerraUSD ("UST"), a stablecoin whose value was intended to remain pegged to one U.S. dollar through the "Terra Protocol."  Compl. ¶ 35.  In theory, the Terra Protocol incentivized market participants to arbitrage between UST and LUNA in a way that would always maintain UST's $1 peg through supply and demand.  *Id.* ¶¶ 37-38.  Starting in 2021, holders of UST could "stake" their tokens in Terraform's Anchor Protocol, which facilitated lending and borrowing at highly subsidized rates.  *Id.* ¶ 39.

**2.    Terraform Enlists Jump Trading as a Market Maker**

Terraform soon enlisted the services of Jump Trading ("Jump") to serve as a market maker for Terraform tokens, including UST and LUNA.  *Id.* ¶¶ 69, 230; *Terraform*, 708 F.Supp.3d at 475.  In return, Jump received contractual rights to purchase LUNA at steeply discounted prices.  Compl. ¶ 230; *Terraform*, 708 F.Supp.3d at 458-59.  As one Jane Street employee recognized, Jump had a "monopoly on all the execution" for certain Terraform projects.  Compl. ¶ 80.  As both market maker and equity backer, Jump acted as Terraform's agent and as a conduit of Terraform's inside information at critical moments relevant to this lawsuit.  *Infra* pp. 7-9.

**3.    Terraform Commits Fraud and Collapses**

The Terra Protocol did not work: when UST experienced a significant depeg in May 2021, UST's $1 peg did not hold under real market conditions.  Compl. ¶¶ 42-45.  UST regained its $1

2

peg only after Jump stepped in to covertly manipulate the market to artificially restore it. *Id.* ¶¶ 41, 42, 124-25. Jump thus evolved from market maker to co-conspirator in massive securities fraud in which Terraform and Jump fraudulently touted UST's $1 peg and the Terra Ecosystem more broadly despite knowing that the Terra Protocol could not maintain the peg. The fraud worked: market participants flooded into the Terra Ecosystem, which grew from a market capitalization of $8 billion in May 2021 to $45 billion in May 2022. *Terraform*, 708 F.Supp.3d at 462. In May 2022, UST depegged again. Compl. ¶¶ 122, 124, 133. This time, UST never regained its peg and Terraform collapsed. *Id.* ¶¶ 150-51, 154; *Terraform*, 708 F.Supp.3d at 461-65, 475, 479-81.

The securities fraud underlying Terraform's exponential growth and ultimate collapse was the subject of successful civil and criminal enforcement actions against Terraform, Do Kwon, and a Jump subsidiary.[1] The Plan Administrator is also pursuing claims to hold Jump accountable. Dkt. 56, *Snyder v. Jump Trading, LLC*, No. 25-cv-15414 (N.D. Ill. May 1, 2026).

### 4. Jane Street Enters the Market Late and Cultivates an "Informational Advantage"

Jane Street began trading UST in February 2022—only months before Terraform's collapse in May 2022. Compl. ¶ 100. But when Jane Street finally engaged with the Terraform Ecosystem, Jane Street made sure it was positioned to profit—and it did. *Id.* ¶¶ 100-63.

Jane Street employed a systems engineer named Bryce Pratt. *Id.* ¶ 2. Immediately before joining Jane Street in September 2021, Pratt interned at Terraform where he developed close relationships with Terraform employees, including Terraform's Head of Research. *Id.* ¶¶ 2, 52-60. Jane Street used Pratt's personal connections to Terraform employees to obtain not only investment opportunities but also inside information about Terraform. *Id.* ¶¶ 51, 61-77.

---

[1]   *See SEC v. Terraform Labs Pte Ltd.*, No. 23-cv-1346 (S.D.N.Y. Apr. 5, 2024); *United States v. Kwon*, No. 23-cr-151 (S.D.N.Y. Dec. 12, 2025); *In re Tai Mo Shan Ltd.*, Securities Act Release No. 11349, Admin. Proc. File No. 3-22382 (Dec. 20, 2024).

On February 11, 2022, Jane Street made its first investment in UST by purchasing ~10,000 tokens. *Id.* ¶ 100. Days later, a group chat called "Bryce's Secret" was created to facilitate communications between Pratt, on the one hand, and Terraform's Head of Business Development and a Terraform software engineer, on the other hand. *Id.* ¶¶ 65-71. Although Pratt was initially coy about his ties to Jane Street, his true intention of securing an investment opportunity for Jane Street was quickly revealed. *Id.* ¶¶ 67-69 (disclosing that Pratt worked for "Jane Streeeeeeeet" and wanted to participate in a Terraform "raise"). That same day, Pratt separately introduced Terraform's Head of Business Development to ███████████████████████████████ ███████████████████████████████████ *Id.* ¶ 71.

In February and March 2022, Terraform and Jane Street unsuccessfully negotiated a financing deal through which Jane Street could purchase LUNA at a discount. *Id.* ¶¶ 71-76. In April, Jane Street separately acquired nearly 200 million UST on the Binance platform. *Id.* ¶ 100. Jane Street staked its UST in Anchor, earning a subsidized 20% return. *Id.* ¶ 101.

To protect Jane Street's growing investment in Terraform tokens, Jane Street's traders turned to Pratt to obtain inside information from Terraform. When questions came up, Pratt would "ask [his] friends" at Terraform for the answers. *Id.* ¶ 77; *id.* ¶ 81 (Pratt "will ask friends" at Terraform "if they know the exact day/time the update will occur"); *id.* ¶ 83 (Pratt will ask Terraform's Head of Research to "confirm[] numbers"); *id.* ¶ 79 (Pratt will "ask and get a definitive answer" as to questions about Anchor); *id.* ¶ 63 (Pratt provided "color" on LUNA pricing "according to [his] sources"); *id.* ¶ 78 (halting conversations about "short LUNA target" to "wait for Bryce to get back to talk about this"); *id.* ¶ 80 (Pratt says "Terra is probably going to say no" to a specific deal); *id.* ¶ 93 (Pratt provided estimates he got from "trusted sources"); *id.* ¶ 98 (Pratt relayed information from his "friend" about UST transactions).

Everyone understood what Pratt was doing. In response to his frequent questions, Terraform's Head of Research teased Pratt about the "defi info" that "JS seems very hungry for." *Id*. ¶ 84. On one occasion, Defendant Michael Huang, a Jane Street trader, questioned publicly available information about Terraform. *Id.* ¶¶ 23, 85. Pratt proposed a solution: "honestly I'll just ask [Terraform's Head of Research], he should know." *Id.* ¶ 85. Pratt confirmed that Huang's public "source" was "outdated," and provided new non-public figures. *Id.* Huang responded: "I'm like kind of mad this isn't just in [Terraform's] docs." *Id.* Pratt's response? "On the other hand shouldn't you be slightly pleased that you have an informational advantage :')." *Id.*

Jane Street appears to have had limited protocols in place to ensure that its traders did not trade while in possession of inside information. *Id.* ¶¶ 141-42. At least one trader thought that "mnpi didn't really exist in crypto." *Id.* ¶ 141. Jane Street's compliance department apparently had not even "start[ed] thinking about how MNPI might exist in crypto." *Id.* ¶ 142.

For his part, Pratt knew that Terraform's employees were prohibited from disclosing inside information, and that doing so was a violation of their obligations to Terraform. As an intern, Pratt had been subject to Terraform's "Code of Ethics," which contained an insider-trading policy prohibiting insiders from providing inside information to outsiders "who may trade LUNA tokens on the basis of that information." *Id.* ¶ 53. Pratt kept his communications with Terraform employees "Secret" because he knew they were wrong. *E.g., id.* ¶ 88 (PRATT: "don't share pls").

### 5. Jane Street Trades on Inside Information to Front-Run Terraform's Collapse

In mid-April 2022, Terraform announced that it would move UST to a new "curve pool," a mechanism offered by a prominent decentralized exchange, Curve. *Id.* ¶ 103. This was significant market-facing activity. A primary concern in decentralized finance is liquidity. A curve pool increases liquidity by "pooling" multiple cryptocurrencies into a single pool and essentially automating market-making. The ratio of the different tokens within the curve pool impacts the

price for each asset. UST's primary liquidity on Curve sat in a pool that paired UST against a basket of other major stablecoins (the so-called "3pool" of crypto tokens DAI, USDC, and USDT). Terraform planned to switch UST's pairing from the 3pool to the "4pool," which was expected to become operational in May. *Id*. ¶¶ 103, 106. But important mechanics of the switch were not public, including the timing and the amount of UST that would be unpaired from the 3pool. *Id*. ¶¶ 106, 110, 116-17. That information mattered because Terraform's withdrawal of UST from the 3pool pairing to deploy into the 4pool would temporarily reduce the depth of UST's liquidity, leaving UST more vulnerable to losing its peg. *Id*. ¶¶ 110, 116-17. Concern about market distortions was acute because Terraform also announced that, starting on May 1, 2022, the interest rate for Anchor would decrease, further impacting UST in ways that risked a depeg. *Id*. ¶ 103.

Through backchannels, Jane Street learned inside information about the mechanics of Terraform's curve pool switch, and thus when and to what extent UST would be vulnerable. *Id*. ¶¶ 4, 77, 81, 83, 84, 96-99, 117-18, 163. Jane Street started planning its exit from UST at the end of April. *Id*. ¶¶ 103-05. Traders considered withdrawing from the Anchor Protocol "$100m ~3days before the [Anchor] rate drop." *Id*. ¶ 104. But despite this planning, Jane Street ultimately did not unstake any of its ~192 million UST from Anchor Protocol. *Id*. ¶¶ 106-07.

Jane Street made its move on May 7, the day of Terraform's curve pool switch. *Id*. ¶¶ 116-18; *see also id*. ¶¶ 4, 77, 81, 83, 84, 96-99, 163. In the early morning, hours before the curve pool switch, Jane Street began unstaking its UST holdings. *Id*. ¶¶ 107-09, 112. By 5:40pm ET, Jane Street had unstaked and sold 97 million UST. *Id*. ¶¶ 109, 112-13, 115-16. At 5:44pm ET, Terraform withdrew 150 million UST from the 3pool pairing. *Id*. ¶¶ 110, 116. Within 30 minutes, Jane Street unstaked and sold nearly all its remaining 85 million UST. *Id*. ¶¶ 111-12, 114-15, 119-20. By the end of May 7, Jane Street had traded out of nearly its entire holding of approximately

192 million UST within a single trading day, all effectively at par. *Id*. ¶¶ 107-17, 119-20, 163.

After Jane Street exited its UST position, UST lost its peg. *Id*. ¶¶ 122-24. Within days, Terraform entered a "death spiral" from which it never recovered, rendering UST worthless. *Id*. ¶¶ 4, 45, 122-24, 149-51, 154, 163. Jane Street avoided hundreds of millions of dollars of losses by unstaking and selling its UST at the perfect moment. *Id*. ¶¶ 107, 120-21, 152, 163.

Jane Street's perfectly timed trade wasn't the result of superior skill: Jane Street had been pumping Terraform for inside information for months and capitalized on that inside information when the opportunity arose. *Id*. ¶¶ 51-121. Within days of Jane Street's miraculous loss avoidance, Terraform's Head of Research reminded Pratt that he had passed him "somewhat useful info" leading up to Terraform's collapse. *Id*. ¶ 118. Given the proximity of this comment to Jane Street's all-too-well-timed trades, this "somewhat useful info" tipped from Terraform's Head of Research was, on information and belief, the mechanics of the curve pool switch. *Id*. ¶¶ 117-18. That same Head of Research interviewed for a job at Jane Street weeks earlier—with Jane Street traders involved with Jane Street's UST and LUNA trades—but had not yet received an offer. *Id*. ¶¶ 90, 118. Within days of Terraform's collapse, Jane Street offered him a job. *Id*. ¶¶ 155-56.

**6. Jane Street Trades on Inside Information to Profit as Terraform Collapses**

In addition to avoiding losses, Jane Street separately profited by taking perfectly timed short positions (*i.e.*, by betting on Terraform's demise) after misappropriating sensitive Terraform information Jane Street learned from Terraform's agent, Jump. *Id*. ¶¶ 122-48, 152, 163.

By May 9, as UST's $1 peg faltered, the question on Jane Street's mind was whether a capital infusion would save UST's $1 peg. *Id*. ¶¶ 124-27. Jane Street traders discussed shorting LUNA, hypothesizing that "they can't write cheques forever" to prop up UST's $1 peg and, by extension, the price of LUNA. *Id*. ¶¶ 123, 317. Pratt turned to Terraform's Head of Research to suss out an answer: "Y jump not doing their shit." *Id*. ¶ 125. At 12:16pm ET, Terraform's Head

of Research responded: "Tfl/lfg Just gave jump a buncha money." *Id.* ¶ 126.[2]  This was yet another consequential tip; Terraform's Head of Research confirmed that Jump would soon enter the market to defend the peg, a development that would obviously move the market.

Later on May 9, Pratt reached out directly to Terraform's co-founder, Kwon, and started a group message with Kwon and Defendant Huang and ████████████████████ in which Jane Street expressed interest in participating in what was effectively an emergency fundraise for Terraform to avoid collapse. *Id.* ¶ 129.  Kwon responded that Terraform had authorized "Bill from Jump"—that is, Bill DiSomma, Jump's co-founder—to reach out to Jane Street to discuss a deal. *Id.* ¶¶ 129, 131.  Around 5:45pm ET on May 9, Jane Street's co-founder, Defendant Robert Granieri, spoke with DiSomma and Jump's Chief Information Officer.  Dkt. 31-10; Compl. ¶¶ 130-31, 141.  DiSomma then sent Granieri a non-public Terraform strategy document referring to UST, which Granieri forwarded to several Jane Street traders.  Compl. ¶ 131.

Hours later, Granieri emailed a summary of his call with Jump to Jane Street employees, including several ██████████. *Id.* ¶¶ 132-39.  Granieri's email makes clear that, during the May 9 call, Jump conveyed highly sensitive inside information, including information about: Jump's unique interest in the Terraform Ecosystem; efforts that Jump had undertaken on Terraform's behalf to cobble together a rescue package; the specific investment terms that other potential bail-out participants were considering and their appetite to participate; and, tellingly, Jump's "concerning" commitment to only "████ 100-200 mln." *Id.*; Ex. 1.  Granieri interpreted the information he learned from Jump to mean that a rescue package was unlikely, and that even if one materialized, it would be too small to salvage Terraform.  Compl. ¶¶ 132-39.  Given that Terraform

---

[2]   "Tfl" refers to Terraform, while "lfg" refers to the Luna Foundation Guard.  Although nominally independent, LFG was an arm of Terraform that existed to hold and deploy reserves to defend UST's $1 peg in times of market distress.  Compl. ¶¶ 15, 43-44, 79.

was teetering on the edge of collapse, everyone understood that this information was highly sensitive and market moving.

Ex. 1.

informally walling ▇▇▇▇ off from the desk ▇▇▇▇ think there's any legal requirement to do so." *Id*. But, contrary to Granieri's statement, there was no "wall." Granieri emailed traders who were trading UST and LUNA, including the ▇▇▇▇ ▇▇▇▇▇▇. Compl. ¶¶ 71, 131, 136, 139, 143.

Within hours of learning inside information that made a bail-out unlikely, Jane Street shorted LUNA. *Id*. ¶¶ 138-40. Jane Street increased its short position on May 10 (by 12.2 million UST and 1.4 million LUNA), and again on May 11 (by 8.2 million UST and 4.5 million LUNA), netting more than $100 million in profits as Terraform collapsed. *Id*. ¶¶ 140, 144, 147, 152.

Jane Street's suspiciously timed trades garnered public attention. *Id*. ¶¶ 120, 157-62. After strategizing about how to mask its trades, Jane Street decommissioned the crypto "wallets" that it used to execute the trades and even tried to erase all public records of them. *Id*. ¶¶ 158-62.

### 7.   This Litigation

Terraform Labs filed for bankruptcy on January 21, 2024. *In re Terraform Labs Pte. Ltd. et al.*, No. 24-10070 (Bankr. D. Del.). Pursuant to the Chapter 11 Plan, Plaintiff Todd R. Snyder was appointed as the Plan Administrator. Compl. ¶ 11. The Chapter 11 Plan tasks the Plan Administrator with managing the estate and pursuing affirmative litigation against wrongdoers (like Jane Street) to recoup assets for the creditors and Individual Victims who contributed claims to the Wind Down Trust. *Id*. ¶¶ 11-13, 17. This lawsuit followed.

### LEGAL STANDARD

The Court must accept the complaint's well-pleaded factual allegations as true and draw every reasonable inference in the Plan Administrator's favor. *See Ashcroft v. Iqbal*, 556 U.S. 662,

9

678 (2009). The complaint survives so long as it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.*[3] Under the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act, a plaintiff alleging securities fraud based on deceptive acts "must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Oklahoma Firefighters Pension & Ret. Sys. v. Musk*, 779 F.Supp.3d 396, 417 (S.D.N.Y. 2025). In the insider-trading context, however, the Second Circuit has "recognize[d]" that, "because insider tips are typically passed on in secret, it is often impractical to require plaintiffs to allege these details with particularity." *In re Archegos 20A Litig.*, 156 F.4th 108, 120 (2d Cir. 2025) (quoting *SEC v. One or More Unknown Traders in Securities of Onyx Pharms., Inc.*, 296 F.R.D. 241, 248 (S.D.N.Y. 2013)). "Rule 9(b) may be relaxed to allow a plaintiff to plead facts that imply the content and circumstances of an insider tip." *Id.* As Judge Oetken explained in *Onyx*, because tips are typically "known only to the defendant and the insider," the complaint need only "sketch the outlines of an unlawful trade" so that "stepping back, the Court can see a comprehensible picture of insider trading." 296 F.R.D. at 249, 253; *SEC v. Watson*, 659 F.Supp.3d 409, 414 (S.D.N.Y. 2023).

## ARGUMENT

I.    **THE COMPLAINT STATES CLAIMS ON BEHALF OF INDIVIDUAL VICTIMS.**

   A.    **Insider Trading**

Section 10(b) of the Securities Exchange Act prohibits deceptive practices like insider trading "in connection with" a securities transaction. 15 U.S.C. § 78j(b).[4] Section 20A of the

---

[3]   All citations, internal quotation marks, and emphasis omitted unless otherwise noted.

[4]   Insider trading is a deceptive scheme prohibited by Rule 10(b)-5(a) and (c). 17 C.F.R. § 240.10b-5(a), (c). The SEC promulgated an insider-trading rule stating that § 10(b) and Rule 10b-5 prohibit "the purchase or sale of a security . . . on the basis of material nonpublic information . . . in breach of a duty of trust or confidence" owed to the "source of the material nonpublic information." *Id.* § 240.10b5-1(a).

Exchange Act codifies a private cause of action for individuals who traded "contemporaneously" with an inside trader and authorizes damages up to the amount of the inside trader's "profit gained or loss avoided." *Id.* § 78t-1(a)-(b); H.R. Rep. No. 100-910, at 7 (1988); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994) ("Congress added § 20A . . . to remedy the very specific problems inherent in prosecuting insider trading cases."). Liability under § 20A requires (i) a predicate insider-trading violation of the Exchange Act, and (ii) that the plaintiff traded contemporaneously with the defendant. *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F.Supp.3d 111, 175 (S.D.N.Y. 2021).

This is a misappropriation insider-trading case. "The 'misappropriation theory' holds that a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he [1] misappropriates confidential information for securities trading purposes, [2] in breach of a duty owed to the source of the information." *United States v. O'Hagan*, 521 U.S. 642, 652 (1997); *Veleron Holding, B.V. v. Morgan Stanley*, 117 F.Supp.3d 404, 430 (S.D.N.Y. 2015) ("*Veleron*"). In the context of a misappropriation claim, the "term 'insider trading' actually is a misnomer" because liability extends to "outsiders" who become "tippees" by "receiving inside information improperly," and to "temporary insiders" who are "legitimately . . . given access to confidential corporate information solely for corporate purposes." *SEC v. Tome*, 638 F.Supp. 596, 616-17 (S.D.N.Y. 1986). In either scenario, the misappropriation theory bars trading by an outsider "in breach of a duty owed not to a trading party, but to the source of the information," targeting outsiders "who were entrusted with material nonpublic information, and in violation of their fiduciary duty to the source of that information, used the information for their own gain." *Archegos*, 156 F.4th at 118. Both circumstances apply here, and Jane Street is liable as both a tippee and a temporary insider.

11

Tippee Liability.[5]  Terraform employees misappropriated Terraform's inside information and tipped it to Jane Street for their own benefit, making Jane Street liable as a tippee.  Jane Street *never* legitimately possessed the information that it obtained from Terraform employees, who should not have tipped it in the first place.  Jane Street (as tippee) assumed the Terraform employees' duty to Terraform, which Jane Street breached by trading UST and LUNA without disclosing the inside information to the market.  *See*, *e.g.*, *Dirks v. SEC*, 463 U.S. 646, 659-60 (1983); *United States v. Falcone*, 257 F.3d 226, 229-35 (2d Cir. 2001) (Sotomayor, J.); *SEC v. Obus*, 693 F.3d 276, 284-85 (2d Cir. 2012); *United States v. Martoma*, 894 F.3d 64, 74 (2d Cir. 2017); *United States v. McPhail*, 831 F.3d 1, 4 (1st Cir. 2016); *Watson*, 659 F.Supp.3d at 414; *SEC v. Carroll*, 9 F.Supp.3d 761, 767 (W.D. Ky. 2014).

Temporary Insider Liability.[6]  By injecting itself into bail-out negotiations, Jane Street learned highly sensitive, market-moving inside information belonging to Terraform about the likelihood that Terraform would enter a "death spiral."  In contrast to the inside information that Jane Street received as a tippee, Jane Street legitimately obtained Terraform's inside information during the May 9 call between Granieri and Jump.  However, Terraform authorized that information to be conveyed only for "corporate purposes" and in the context of "a special confidential relationship"—namely so that Jane Street could evaluate a potential transaction in

---

[5]  Under a tipper/tippee theory, Jane Street is liable for insider trading if: (1) the Terraform employees possessed material, nonpublic information; (2) the Terraform employees disclosed inside information to Jane Street in violation of their own duties to Terraform; (3) Jane Street traded UST or LUNA while in possession of the inside information; (4) Jane Street knew or should have known that the Terraform employees violated a relationship of trust or confidence by providing the non-public information; and (5) the Terraform employees benefitted by the disclosure to Jane Street.  *See SEC v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998).

[6]  Under a temporary-insider theory of insider trading, Jane Street is liable if Jane Street (1) possessed material, nonpublic information, (2) owed a duty to Terraform to keep such information confidential, (3) breached this duty by trading on the basis of that information, and (4) acted with scienter.  *See Veleron Holding, B.V. v. Morgan Stanley*, 694 F. App'x 858, 862 (2d Cir. 2017); *SEC v. Brewer*, 2025 WL 1548765, at *9 (S.D.N.Y. May 30, 2025).

12

which Terraform would sell tokens to raise funds and avoid collapse. *Dirks*, 463 U.S. at 655 n.14. The highly sensitive circumstances of the May 9 call, coupled with Granieri's after-the-fact directive to keep the summary confidential, confirm that Jane Street—explicitly or implicitly— assumed a duty to keep the information it learned confidential and to use it only for Terraform's corporate purposes. *Veleron*, 117 F.Supp.3d at 437-47 (analyzing similar circumstances and finding potential duty and breach). Instead, Jane Street transmitted the inside information to its traders for the forbidden purpose of lining Jane Street's own pockets at Terraform's expense. Compl. ¶¶ 131-40, 143-45. Financial institutions have entire departments dedicated to creating walls to ensure non-public information legitimately obtained by private-side business units is not illegitimately passed to traders taking positions in the public markets.[7] Jane Street maintained the opposite of a "wall" here, intentionally drawing its traders into confidential discussions involving market-moving inside information. *Id.* ¶¶ 131-43. Those traders then took hugely profitable short positions, rendering Jane Street liable as a temporary insider for insider trading. *See, e.g.*, *United States v. Chow*, 993 F.3d 125, 136-39 (2d Cir. 2021); *United States v. Kosinski*, 976 F.3d 135, 142-52 (2d Cir. 2020); *Brewer*, 2025 WL 1548765, at *10-12; *Tome*, 638 F.Supp. at 621.

Jane Street raises a host of objections and argues that the complaint does not state even a plausible case of insider trading. But Jane Street is wrong. Tellingly, although this is a misappropriation insider-trading case, Jane Street ignores the elements of such a claim—failing even to cite the governing legal standards for tippee or temporary-insider liability. Most of Jane Street's authorities are not even insider-trading cases. Instead, Jane Street relies on generic § 10(b) rule statements—pretending that decades of caselaw adapting these doctrines to the specific

---

[7]    *See generally* U.S. Sec. & Exch. Comm'n, *Staff Summary Report on Examinations of Information Barriers: Broker-Dealer Practices Under Section 15(g) of the Securities Act of 1934* (2012), https://www.sec.gov/about/offices/ocie/informationbarriers.pdf.

context of insider trading does not exist.[8]  Applying the correct law—and "stepping back" to consider the complaint as a whole—the Court should reject Jane Street's arguments for dismissal. The complaint "sketch[es] the outlines of an unlawful trade" and paints a "comprehensible picture of insider trading." *Onyx*, 296 F.R.D. at 253.

"Jane Street Wasn't Tipped."  Jane Street first argues that the allegations are too vague to state a plausible claim that Jane Street was tipped inside information by Terraform employees, including the timing of the curve pool switch.  MTD.13, 18.  But the complaint alleges a coordinated effort by Jane Street to pump Terraform employees for inside information; the contents of tips that Pratt solicited and received; and even Pratt's own recognition that his efforts garnered for Jane Street an "informational advantage." *E.g.*, Compl. ¶¶ 77-99.  With respect to the timing of the curve pool switch, the complaint identifies a pattern of tippee/tipper communications and suspiciously timed trades, alleges on information and belief that Terraform's Head of Research tipped Pratt about the timing of the curve pool switch, and points to a specific text from the alleged tipper to the alleged tippee as corroborating "information" supporting the allegation of a tip.  *Id*. ¶¶ 77-99, 117-19.  At this early stage, this kind of "circumstantial evidence" is sufficient to plausibly allege that Jane Street was tipped.  *Carroll*, 9 F.Supp.3d at 768-70; *id*. at 773 (observing case "will likely turn on the credibility of the parties' witnesses at trial").

Jane Street's authorities are far afield and unpersuasive.  In *Onyx* (at MTD.13), unlike here, the SEC alleged *nothing* about the content or circumstances of the supposed tip; the complaint did

---

[8]    Many of Jane Street's authorities are § 10(b) *misrepresentation* cases, not *scheme* cases.  Insider trading constitutes an unlawful scheme barred by subsections (a) and (c) of Rule 10b-5, not an unlawful misrepresentation barred by subsection (b).  *In re Take-Two Interactive Sec. Litig.*, 551 F.Supp.2d 247, 310 (S.D.N.Y. 2008).  The logic of a misrepresentations case cannot be imported unthinkingly to the scheme context.  "Scheme liability claims brought under subsections (a) and (c) of Rule 10b-5 'must show: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."'" *Oklahoma Firefighters Pension & Ret. Sys.*, 779 F.Supp.3d at 418; *SEC v. Wey*, 246 F.Supp.3d 894, 915-16 (S.D.N.Y. 2017).

not even specify potential sources of the tip.  296 F.R.D. at 252.  As for *Gordon v. Sonar Capital Management* (at MTD.18), the court's reasoning is now on shaky ground to the extent it stringently applied heightened pleading standards to tips.  962 F.Supp.2d 525, 529-30 (S.D.N.Y. 2013).  Accusations of tipping in insider-trading cases need not satisfy the exacting standard applied to other fraud allegations.  *Archegos*, 156 F.4th at 120 ("[B]ecause insider tips are typically passed on in secret, it is often impractical to require plaintiffs to allege these details with particularity.").[9]

"None of the Tipped Information Was Material."  Jane Street next insists that, even if it was tipped, none of the inside information was material.  MTD.14, 17-18.  "Information is material if 'there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest].'"  *Warde*, 151 F.3d at 47.  This is a quintessential fact question, and Jane Street's own authority cautions that "a complaint may not be properly dismissed unless the misstatements are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp.,* 783 F.3d 383, 390 (2d Cir. 2015); *see also Veleron*, 117 F.Supp.3d at 430 ("determination of materiality" in insider-trading case was "mixed question of law and fact that generally should be presented to a jury").

Notably, Jane Street does not even attempt to argue that the inside information it learned on May 9 about Terraform's longshot bail-out efforts was immaterial.  Instead, Jane Street plucks other tips out of the complaint and argues that none mattered for Jane Street's (or anyone else's) trading.  Not so.  Take, for example, the timing of Terraform's curve pool switch.  The exact timing of that market-facing activity was obviously something that a "reasonable investor" would want

---

[9]    Jane Street's suggestion (at MTD.14 n.7) that extensive discovery has already transpired is misleading.  The Plan Administrator received only a reproduction of documents produced by Jane Street to the SEC, not discovery tailored to this case.

15

to know; the switch rendered UST vulnerable and altered the risk for Terraform tokens at a specific moment. Advance knowledge of *when* that vulnerability would materialize was material to an investor. *Contra* MTD.14 (arguing nothing about curve pool switch was material). Or consider the inside information Pratt solicited from Terraform employees. Pratt himself recognized this information created an "informational advantage" for Jane Street. Compl. ¶ 85. After all, if the information was not material for investment decisions, why did Jane Street traders, *when deciding how to trade*, ask Pratt to obtain it? *Id*. ¶¶ 77-88. The stream of tips from Terraform employees, considered as a whole, was obviously material to trading decisions. *Contra* MTD.13, 17-18 (arguing inside information was only "generic," so Jane Street is in the clear).

"Jane Street Did Not Trade Based on Inside Information." Jane Street disclaims trading "in connection" with inside information because, supposedly, there is a "plausible 'alternative explanation'" for its trades. MTD.14-16. Jane Street ignores controlling Second Circuit precedent.

The Second Circuit has flatly rejected Jane Street's argument that inside information must be the reason for a trade: "trading while in knowing possession of inside information is sufficient to establish that the trades were made on the basis of the inside information." *Veleron Holding, B.V. v. Morgan Stanley*, 694 F. App'x 858, 862 (2d Cir. 2017) (citing *United States v. Teicher*, 987 F.2d 112, 120-21 (2d Cir. 1993)); *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014); *In re Oxford Health Plans, Inc., Sec. Litig.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999) ("An insider trading violation 'occurs when a trade is conducted in "knowing possession" of material nonpublic information.' It does not require, as defendants suggest, that a causal connection exist between the knowing possession of the information and the trade, that is, it does not require that the defendant 'use' the information when trading."). The SEC agrees. 17 C.F.R. § 240.10b5-1.[10]

---

[10]    Lest there be any doubt, § 20A imposes liability on those who trade merely "while in possession of material, nonpublic information" without reference to their motivations. 15 U.S.C. § 78t-1(a), (b)(1).

16

Remarkably, Jane Street's brief *omits* this controlling authority and argues that its traders' subjective reasons for taking long and short positions matter even though the Second Circuit says they don't.  Worse, the authorities that Jane Street *does* cite (at MTD.14) are irrelevant.  In *Archegos*, the plaintiff failed to identify any indicia of a tip in the first place other than supposedly nefarious trading patterns.  *See* 156 F.4th at 120.  Because there was an "alternative explanation" for the supposedly nefarious trading *and no other indicia of a tip*, the Second Circuit found it implausible that a tip had occurred in the first place.  *Id.*  And *Lentell v. Merrill Lynch & Co.* is not even an insider-trading case.  396 F.3d 161 (2d Cir. 2005).  *Lentell*'s generic § 10(b) rule statement misses the mark when the Second Circuit has already resolved the context-specific question of what it means for trading to be "in connection with" inside information.

Finally, even if they were relevant under controlling law, Jane Street's traders' motivations present another fact question.  *See* MTD.14-16 (Jane Street's lengthy, fact-y explanation).

"Jane Street Shorted Before Misappropriating Information."  Jane Street protests that the complaint has a "timing" problem: Jane Street had already decided to short some LUNA prior to misappropriating information about the high likelihood of Terraform entering a "death spiral," so (according to Jane Street) the shorts it put on *after* learning that inside information were not the result of learning the inside information.  MTD.18-19.  But Jane Street cannot—and does not—contest that its traders took additional substantial (and extremely profitable) short positions on May 9, 10, and 11 while in possession of inside information misappropriated from Terraform on May 9.  Compl. ¶¶ 139-40, 144, 147-48.  There simply is no "timing flaw."  *Contra* MTD.18.

"Jane Street's Insider Trading Caused No Losses."  Jane Street argues that its insider trading did not cause losses, both because Terraform's own fraud was an "intervening cause" and because, when Jane Street misappropriated information about Terraform's likely "death spiral,"

17

the price of LUNA had already started to decline.  MTD.16-17, 21-22.  Neither argument works.

*First*, the rule under § 20A is that the Individual Victims' losses are presumed to be the result of trading "contemporaneously" in a market tainted by Jane Street's fraud.  *Supra* pp. 10-11.

*Second*, accepting Jane Street's flawed "intervening cause" argument to negate that presumption would immunize insider traders across the board if they traded only where the company's stock declined.  Whatever caused the decline—depressed earnings, departure of key employees, or rampant fraud—would always be an "intervening cause" that caused investor losses and (according to Jane Street) severed the causal link.  That can't be right; fortunately, it isn't.

*Kaplan v. S.A.C. Capital Advisors* is on point and forecloses Jane Street's "intervening cause" argument.  40 F.Supp.3d 332 (S.D.N.Y. 2014).  SAC (like Jane Street) front-ran bad news and profited.  *Id*. at 336-37.  Around the same time, additional bad news was disclosed, further depressing the stock value.  *Id*. at 337.  Attempting a similar "intervening cause" argument, SAC claimed that it was not liable for losses avoided due to the additional bad news, only for the bad news it knew about before inside trading.  *Id*. at 340 (insisting SAC "should not be liable for losses due to factors outside [its] control").  The court flatly rejected this argument.  Although SAC was not "responsible for the increased losses to the plaintiffs," "by trading on inside information, SAC assumed the risk that other independent factors could compound the decrease in share value," thereby increasing SAC's liability.  *Id*. (citing *Elkind v. Liggett & Myers*, 635 F.2d 156 (2d Cir. 1980)); 635 F.2d at 173 n.29 (observing that "tippee takes the risk that by the time the tip is disclosed the market price may reflect disclosure of information more adverse than the tip and other adverse market conditions").  It is no wonder that Jane Street's only authority is a RICO case that in no way supports Jane Street's "intervening cause" argument in the insider-trading context.  MTD.22 (citing *First Nationwide Bank v. Gelt Funding Corp*., 27 F.3d 763, 769 (2d Cir. 1994)).

*Third*, there is no way to determine "as a matter of law," as Jane Street requests, that, by the time Jane Street misappropriated Terraform's inside information on May 9, LUNA's $30 price already reflected that inside information. *Contra* MTD.21-22. In fact, all inferences are to the contrary. When the market realized no bail-out was forthcoming, the price of LUNA plummeted to effectively $0. Compl. ¶¶ 149, 151. In the interim, Jane Street made over $100 million placing bets on Terraform's demise, while other investors who did not have access to that inside information lost everything. *Id.* ¶ 152. That is not what happened in *60223 Trust v. Goldman, Sachs & Co.* (at MTD.21-22), a misrepresentations case, where the stock price gradually declined despite the falsely optimistic statements and, by the time the disclosures were made, it had already lost nearly all its value. 540 F.Supp.2d 449, 460-61 (S.D.N.Y. 2007).

"No Contemporaneous Trades." The Individual Victims allege that they each traded "UST and/or LUNA between May 7, 2022 and May 31, 2022," Compl. ¶¶ 18, 206, 210, 267, 291, "contemporaneously" with Jane Street's insider trading as required by § 20A, 15 U.S.C. § 78t-1. Jane Street considers this window too broad and asks that, "to the extent that" the Individual Victims "seek to recover for non-contemporaneous trades," the Court should reject those claims. MTD.23. But whether the alleged trading window is "contemporaneous" turns on how long the market took to digest the disclosed inside information—an issue better resolved on a factual record. *See, e.g.*, *In re Am. Bus. Computs. Corp. Sec.*, 1994 WL 848690, at *4 (S.D.N.Y. Feb. 24, 1994).

"No Insider Breached a Duty." Jane Street insists that no applicable duty to Terraform was breached so Jane Street cannot be liable for insider trading as a tippee or temporary insider. MTD.19-21. But the complaint alleges that (i) the Terraform employees breached their duties to Terraform, making Jane Street liable as a tippee, and (ii) Jane Street breached a duty of confidence to Terraform, which Jane Street assumed by participating in confidential bail-out discussions.

19

*First*, by not challenging it, Jane Street effectively concedes that Terraform employees had a duty not to disclose Terraform's inside information for their own benefit, and that they violated this duty by disclosing inside information to Jane Street. Terraform's Head of Research tipped Jane Street to curry favor and a job offer; his self-serving strategy worked. Compl. ¶¶ 84-91, 117-18, 125-26, 155-56. Jane Street also does not contest that it "knew or should have known" that the Terraform employees "violated a relationship of trust or confidence by providing the non-public information." *Supra* n.5. Nor could it: Pratt understood that his communications with Terraform's employees were wrong and took steps to keep them "Secret." Compl. ¶¶ 65-70, 88. Under blackletter tipper/tippee law, Jane Street's trading while in possession of inside information tipped by the Terraform employees in breach of their duties makes Jane Street liable as a tippee.

*Second*, as a temporary insider, Jane Street assumed and breached a duty of confidentiality to Terraform.[11] Jane Street injected itself into financing discussions and learned highly sensitive information about Terraform's efforts to cobble together a bail-out, including the high likelihood that those efforts would fail. "Qualifying" temporary insider "relationships are marked by the fact that the party in whom confidence is reposed"—*i.e.*, Jane Street—"entered into a relationship . . . to serve the interests of the party entrusting him or her with such information"—*i.e.*, Terraform. *Kosinski*, 976 F.3d at 144 (quoting *Falcone*, 257 F.3d at 234-35). That is exactly what happened here: the only reason that Jane Street came to legitimately possess inside information alerting it to Terraform's likely "death spiral" is because Jane Street positioned itself as a potential funding

---

[11] Jane Street contests that Jump breached "fiduciary duties" to Terraform (at MTD.19-21), and that Jane Street breached "fiduciary duties" to Jump (at MTD.21). But that misapprehends the inquiry. Jane Street, as a temporary insider, assumed fiduciary-like duties to the source of the inside information—Terraform. That Jump, rather than Terraform, conveyed Terraform's inside information is irrelevant. Jump acted with Terraform's blessing as Terraform's agent to fundraise for a bail-out and, in the process, conveyed Terraform's inside information—including the potential terms of a fundraise and the size of Terraform's shortfall. Compl. ¶¶ 129-31; *SEC v. Lyon*, 605 F.Supp.2d 531, 546 (S.D.N.Y. 2009) (intermediary conduit of inside information does not sever the chain).

source to avert that outcome.    Compl. ¶¶ 122-63; *SEC v. Conradt*, 947 F.Supp.2d 406, 411 (S.D.N.Y. 2013) ("feigning fidelity to the source of [the] information" typifies misappropriation).

Jane Street protests that it maintained only an "arm's-length relationship" with Jump and, by extension, Terraform.  But the Second Circuit has already explicitly rejected this argument—at least twice—and reiterated that a duty can arise when otherwise arm's-length parties explicitly or implicitly agree to keep each other's confidences.  *Chow*, 993 F.3d at 138; *Kosinski*, 976 F.3d at 148.  Indeed, it is by now established that "a fiduciary relationship, or its functional equivalent," arises where "there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties."  *Kosinski*, 976 F.3d at 144 (quoting *Falcone*, 257 F.3d at 234-35); *Chow,* 993 F.3d at 138 ("tacit understanding" can trigger duty (citing *Falcone*)); *SEC v. Suman*, 684 F.Supp.2d 378, 389 (S.D.N.Y. 2010) (agreement to maintain confidence can trigger duty); *Conradt*, 947 F.Supp.2d at 412 ("implicit mutual understanding of confidentiality" can trigger duty); *McPhail*, 831 F.3d at 4-7 (implicit "expectation of trust and a reliance on discretion" can trigger duty); *id*. at 6 ("inside information" shared "in confidence" with implicit expectation that it is not "shared further" triggers duty); *SEC v. McGee*, 895 F.Supp.2d 669, 680 (E.D. Pa. 2012) (similar); *SEC v. Lund*, 570 F.Supp. 1397, 1402 (C.D. Cal. 1983) (being given "access to confidential information intended to be available only for a corporate purpose and not for the personal benefit of anyone" can trigger duty); *see also* 17 C.F.R. § 240.10b5-2(b)(1)-(2) (SEC rule providing that "duty of trust or confidence" in the insider-trading context include "[w]henever a person agrees to maintain information in confidence"); H.R. Rep. No. 100-910, at 9 (Congress agrees).

Here, the complaint plausibly alleges that Jane Street either explicitly or implicitly agreed to keep the inside information it learned from Jump confidential.  The obvious inference is that

everyone on the May 9 call between Jane Street and Jump understood the significance of the inside information exchanged and agreed to keep it confidential.  Jump, as an equity backer of Terraform, would have expected and demanded that Jane Street keep this negative, market-moving inside information confidential.  And, given the obvious sensitivities, Jane Street would have agreed. That is precisely why, when Granieri summarized the information learned in an email to Jane Street's traders, he explicitly directed them (twice) to keep the information confidential.  Compl. ¶¶ 134-37; Ex. 1.  Granieri even suggested that the information may need to be walled off from other Jane Street employees.  *Id*.  At the very least, the complaint plausibly alleges that the participants in the May 9 call maintained an implicit understanding of discretion, giving rise to a duty of confidentiality.  Indeed, common sense dictates that the relationship between a distressed company on the brink of collapse and a potential financing source "inherently . . . implies a duty of confidentiality."  *Tome*, 638 F.Supp. at 621; *Veleron*, 117 F.Supp.3d at 435-47.

After obtaining inside information under the guise of participating in a bail-out, Jane Street breached its duty to Terraform by passing that information to its traders, who did not use the information for legitimate corporate purposes but instead proceeded to trade in ways that hastened Terraform's collapse.  That is textbook misappropriation.  *Supra* pp. 12-13 (collecting authorities).

Jane Street's heavy reliance on *Archegos* (at MTD.19-21) is misplaced.  The defendants (large banks) sold derivatives to Archegos that resulted in Archegos accumulating synthetic equity positions in various companies (the plaintiffs).  156 F.4th at 112-13.  To hedge their own books, the defendants purchased stocks issued by the plaintiffs.  *Id*.  When Archegos defaulted on margin calls, the defendants liquidated their holdings.  *Id*. at 112, 114.  Because nothing about the defendants' relationship with Archegos suggested that the parties had agreed to keep each other's confidences, the Second Circuit had no trouble concluding that the defendants were allowed to

liquidate their positions after learning of Archegos' default (before it became public) and that doing so breached no duty to Archegos—indeed the relevant contracts contemplated that very action. *Id*. at 119-20. Nor did Archegos, by telling the defendants about its own default, breach any duty, thereby creating tipper/tippee liability. *Id*. at 120-21. Archegos owed no duties to the companies in the first place; it held no ownership stake and possessed none of the companies' inside information. *Id*. at 117-18. Because Archegos owed no duty to the plaintiffs, the defendants could not have inherited or breached one under a tippee/tipper framework. *Id*. at 120.

The better analogy is *Veleron*, a case in which, like here, a financial institution learned highly sensitive inside information as part of restructuring negotiations for a distressed company and then traded while in possession of that inside information. 117 F.Supp.3d at 418-23, 431-32. The court held that, in those circumstances and given the highly sensitive nature of the discussions, the defendants might have explicitly or implicitly assumed a duty of confidentiality—and denied the defendants' motion for summary judgment to allow the factfinder to decide. *Id*. at 435-47 (fact question whether defendant "owed Veleron a 10b duty because its position vis-à-vis Veleron gave Veleron an expectation of confidentiality that 'the trade's practice would justify'").

### B.    Control Person Claims

Jane Street and Granieri are liable as control persons under § 20(a) of the Exchange Act. 15 U.S.C. § 78t(a). Liability requires (i) a primary violation of § 10(b), (ii) control over the violator, and (iii) culpability in the controlled person's fraud. *In re Aegean*, 529 F.Supp.3d at 149-50. Jane Street and Granieri dispute only whether the complaint states a primary § 10(b) violation. MTD.12 n.6. As explained, the complaint alleges a § 10(b) violation: insider trading.

### C.    Unjust Enrichment

Jane Street argues that the Individual Victims' unjust-enrichment claim is duplicative and must be dismissed. MTD.27-28. But a claim is duplicative only where the elements of the two

23

claims overlap. *Nuss v. Sabad*, 2016 WL 4098606, at *11 (N.D.N.Y. July 28, 2016); *Acquard v. Big Heart Pet Brands*, 2020 WL 12904361, at *6-7 (W.D.N.Y. Nov. 30, 2020).  The securities claims require proof of scienter, materiality, and a manipulative device—elements that are not required to state an unjust enrichment claim.  Moreover, Jane Street cannot argue that an unjust enrichment claim is barred as duplicative while also arguing that the Exchange Act does not apply. MTD.24 n.11, 29-30.  *Cf. Trend & Style Asia HK v. Pac. Worldwide*, 2015 WL 4190746, at *6 (S.D.N.Y. July 10, 2015) (no preclusion of unjust enrichment claim where defendant disputed contract's enforceability).  Finally, dismissal would be premature; whether a plaintiff can recover on distinct theories turns "on issues of fact that cannot be determined on the motion to dismiss." *Mason v. Reed's*, 515 F.Supp.3d 135, 146-47 (S.D.N.Y. 2021).

As a fallback, Jane Street argues that the Individual Victims failed to allege a nexus between Jane Street's gains and their losses.  MTD.28 n.14.  But the Individual Victims traded unknowingly in a market tainted by Jane Street's fraud, thereby suffering losses as presumed counterparties to Jane Street's fraudulent trades.  Compl. ¶¶ 18, 107-21, 138-63.

## II.    THE COMPLAINT STATES CLAIMS ON BEHALF OF TERRAFORM.

### A.    Insider Trading

In addition to the Individual Victims, Jane Street is also liable to Terraform for insider trading.[12]  Jane Street misappropriated Terraform's information and used it in ways that hastened Terraform's collapse.  *Id.* ¶¶ 107-21, 130-48, 163.  The fact that Terraform committed a separate fraud does not immunize Jane Street from liability.  Jane Street insists (at MTD.28-29) that Terraform's insider trading claims have unique infirmities, but Jane Street is wrong.

---

[12]    Jane Street recognizes that LFG was "an arm of Terraform."  MTD.23; Compl. ¶ 79 ("LFG = Terra for all intents and purposes").  Plaintiff thus withdraws the claims asserted on LFG's behalf (Counts 2, 5, 8, 11, 14, 17).

"No Reliance."  According to Jane Street, Terraform is categorically barred from bringing an insider-trading case against Jane Street because Terraform knew the inside information, did not face an information asymmetry like other market participants, and therefore could not have "relied" on Jane Street's omission to disclose the information to the market.  MTD.22.  Of the three cases cited, *none* is an insider-trading case.  This is yet another example of Jane Street wrongly applying generic misrepresentations caselaw to the more complicated context of insider trading.

By focusing on the lack of information asymmetry, Jane Street fundamentally misunderstands Terraform's insider-trading claim.  Unlike the Individual Victims, whose insider-trading claims exist because they unknowingly traded in a market tainted by Jane Street's fraud, Terraform has an insider-trading claim against Jane Street because Jane Street stole Terraform's inside information in violation of a duty of confidence and profited by trading on it.  *Cf.* Brief of Reporter and Advisers to Restatement (Third) of Restitution and Unjust Enrichment, as Amici Curiae in Support of Respondent at 21-22, *First Am. Fin. Corp. v. Edwards*, 567 U.S. 756 (2012) (No. 10-708) ("A person who misuses confidential information is liable for any profits he makes as a result . . . .  The whole civil law of insider trading depends on this rule.").

There are numerous misappropriation insider-trading cases like this one in which a corporation contemplates market-facing activity, a temporary insider misappropriates that information and trades in ways that frustrate the company's objectives, and the company subsequently brings insider-trading claims against the misappropriator.  *E.g.*, *Veleron*, 117 F.Supp.3d 404; *CompuDyne v. Shane*, 453 F.Supp.2d 807, 818 (S.D.N.Y. 2006).  These cases exist because "the undisclosed misappropriation" of "confidential information . . . to which the company has a right of exclusive use" "constitutes fraud akin to embezzlement."  *Veleron*, 117 F.Supp.3d at 427 (quoting *O'Hagan*, 521 U.S. at 643).  When Congress enacted the *express* private cause of

25

action for "contemporaneous traders," § 20A, it specifically preserved the ability of companies (like Terraform) to sue misappropriators (like Jane Street) for insider trading under the *implied* cause of action, § 10(b), for what effectively amounts to corporate theft in violation of a duty— and observed that there "clearly are injuries caused by insider trading to others beyond contemporaneous traders." H.R. Rep. No. 100-910, at 27-28.

Here, Terraform anticipated market-facing activity involving the sale of its tokens to raise money for a bail-out, Jane Street learned about Terraform's efforts under circumstances giving rise to a duty of confidence, and Jane Street misappropriated that information by trading in ways that frustrated Terraform's objectives—including by taking short positions that put downward pressure on the price of those same Terraform tokens. That means Terraform has an insider-trading claim.

"No Standing Under *Wagoner*."   The Second Circuit's *Wagoner* rule holds that "a bankruptcy trustee cannot assert claims on behalf of the bankrupt corporation against a third party for fraud when the corporation itself participated in the fraud." *Trott v. Deutsche Bank*, 2025 WL 2783555, at *4 (S.D.N.Y. Sept. 30, 2025) (citing *Shearson Lehman Hutton v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991)).   But Jane Street conflates two distinct frauds: (1) the fraud perpetrated by Terraform and its co-founder, and (2) Jane Street's insider trading.  MTD.29.  Jane Street cannot conflate two frauds, attribute everything to Terraform, and claim immunity for its own misconduct.

In *Wagoner* itself, the court considered two distinct wrongful schemes and held that the debtor could pursue claims arising from one but not the other.  944 F.2d at 117-20.  Specifically, the trustee accused a brokerage firm of (i) aiding the debtor's owner in defrauding his own investors, and (ii) churning the debtor's accounts.  The Second Circuit held that the first claim was barred because the debtor's owner himself participated in the scheme to defraud his own investors, so he had no standing to accuse the brokerage firm of doing the same.  But the Second Circuit held

26

that the second claim—that the brokerage firm churned the debtor's accounts—was not barred. Why? The debtor's owner did not participate in the alleged account churning. By contrast, in both cases cited by Jane Street, the debtor was a central participant in the fraud for which it sought to hold a third-party accountable. MTD.28-29 (citing *In re Grumman Olson Indus.*, 329 B.R. 411, 424 n.5 (S.D.N.Y. 2005); *In re Bernard L. Madoff Inv. Sec.*, 721 F.3d 54, 64 (2d Cir. 2013)).[13]

"*In Pari Delicto.*" The *in pari delicto* defense does not apply. In *Bateman Eichler, Hill Richards v. Berner*, the Supreme Court severely limited the doctrine's application in actions to enforce federal securities laws. 472 U.S. 299, 310-11 (1985); *Pinter v. Dahl*, 486 U.S. 622, 632-33, 635 (1988) (*Bateman Eichler* "provides the appropriate test for allowance of the *in pari delicto* defense in a private action under any of the federal securities laws"). *In pari delicto* can be invoked to bar federal securities claims in limited circumstances "only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Bateman Eichler*, 472 U.S. at 310-11. Neither condition holds in this case.

*First*, as explained, the "violations" that Terraform "seeks to redress" arise from Jane Street's insider trading, not Terraform's separate fraud. If Terraform had survived and no fraud was uncovered, Jane Street would still be liable for insider trading; Terraform "bears" no "responsibility" for Jane Street's fraud. *Pinter*, 486 U.S. at 636 ("Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant.").

*Second*, granting Jane Street immunity from insider-trading liability simply because it

---

[13]    As applied to federal securities law claims, the *Wagoner* rule is in tension with the Supreme Court's reasoning in *Bateman Eichler*. The upshot of *Wagoner* is that one federal securities fraudster may be barred from holding the other accountable—the opposite of what *Bateman Eichler* instructs.

misappropriated inside information from a company that was separately engaged in wrongdoing would "significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Bateman Eichler*, 472 U.S. at 310-11. "Private actions provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [regulatory] action.'" *Id*. at 310. "[I]t is particularly important to permit 'litigation among guilty parties [that will serve] to expose their unlawful conduct and render them more easily subject to appropriate civil, administrative, and criminal penalties.'" *Id*. at 315-16. By "denying any incentive to [Terraform] to bring suit against [Jane Street]" for insider trading, the *in pari delicto* defense would "significantly undermine this important goal." *Id*. at 316. The reasoning in *Bateman Eichler*—in which the Supreme Court determined that one violator of securities laws could hold the other accountable notwithstanding the common-law *in pari delicto* defense— controls here and forecloses Jane Street's *in pari delicto* defense as a matter of law.

### B.    Control Person Claims

For the same reasons that the Individual Victims state control-person claims under § 20(a), so too does Terraform. *Supra* p. 23.

### C.    Unjust Enrichment

Terraform's unjust enrichment claim is also not duplicative. *Supra* pp. 23-24 (explaining why). As for Terraform's losses, Terraform need not prove damages. Unjust enrichment is restitutionary—measured by Jane Street's wrongful gain. Jane Street profited by trading on Terraform's confidential information and so infringed Terraform's exclusive right to it. Compl. ¶¶ 137-38, 162-63, 370-73, 378-81, 386-89. A corporation may recover an insider's trading profits from the misuse of its confidential information even where the corporation has suffered no injury. *Diamond v. Oreamuno*, 248 N.E.2d 910, 912 (N.Y. 1969); Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (A.L.I. 2011) (restitutionary actions require no compensable loss);

28

*Sripetch v. SEC*, 2026 WL 1593329, at \*5-7 (U.S. June 4, 2026) (similar).  Equity imposes a constructive trust on those profits to prevent unjust enrichment.  *Tsutsui v. Barasch*, 892 N.Y.S.2d 400, 402-03 (App. Div. 2009).

### III.    THERE IS NO EXTRATERRITORIALITY PROBLEM.

In a throwaway section at the end of its brief, Jane Street argues that the Plan Administrator does not allege any domestic securities transactions as required to state a claim under the Exchange Act.  MTD.29-30.  This argument is both wrong and premature.  *First*, the Second Circuit has already held that trades executed on Binance give rise to an inference of a domestic transaction under the Exchange Act.  *Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024).  *Second*, it would be premature to dismiss the insider-trading claims based on an extraterritoriality problem, especially because all inferences point in the direction of the existence of domestic transactions.

*First*, in *Williams*, the Second Circuit held the complaint plausibly alleged domestic transactions when, like here, the transactions occurred on Binance.  *Id*. at 136-41.  To determine the situs of a transaction, the Second Circuit applies the "irrevocable liability" test and asks where irrevocable liability to complete a transaction attaches.  *Absolute Activist Value Master Fund v. Ficeto*, 677 F.3d 60, 62, 68 (2d Cir. 2012) (applying *Morrison v. Nat'l Austl. Bank*, 561 U.S. 247 (2010)).  In *Williams*, the Second Circuit considered various characteristics of the Binance exchange and the parties to the relevant transactions, including where buy and sell orders were "matched" on Binance, and where the parties to the transaction were located when they entered Binance's Terms of Service, placed their orders, and sent payments.  96 F.4th at 137-40.  Because transactions "matched" on servers in the United States, and because the plaintiffs were in the United States at key moments related to when liability to complete the transaction attached, there was a plausible inference of domestic transactions.  *Id.*  Here, the complaint alleges that Jane Street traders sitting in New York traded on Binance.  Compl. ¶¶ 63, 100, 105, 120, 316, 326, 336, 345,

29

354, 363.  That is sufficient under *Binance* to plead a plausible domestic transaction.  *See, e.g.*, *Messieh v. HDR Glob. Trading*, 2024 WL 1436755, at *3 (S.D.N.Y. Apr. 3, 2024) ("At the pleading stage, irrevocable liability has been plausibly pleaded when the securities . . . were matched in the United States, or if Terms of Use were entered into in the United States, or if customers residing in the United States placed purchase orders from the United States." (applying *Williams*)); *id*. at *3 n.2 (inferring that matching occurred in United States because employees were located, and the exchange operated in part from, the United States); *Palomino Master v. Credit Suisse Grp*., 2026 WL 848394, at *5-8 (S.D.N.Y. Mar. 26, 2026) (also applying *Williams*).

*Second*, it would be premature to dismiss the complaint based on extraterritoriality concerns, especially "at this early stage of the litigation."  *Binance*, 96 F.4th at 138; *Palomino*, 2026 WL 848394, at *7 (observing that *Williams* "cautions against" premature dismissal based on "too exacting a demand for transactional precision").  Although not technically an affirmative defense, courts treat extraterritoriality like one for pleading purposes.  *See, e.g.*, *Combs v. SafeMoon*, 2024 WL 1347409, at *6 (D. Utah Mar. 29, 2024).

## CONCLUSION

Jane Street profited from Terraform's collapse by misappropriating and trading while in possession of inside information at the expense of other market participants, including the Individual Victims and Terraform.  When others lost everything, Jane Street made off with hundreds of millions of dollars in ill-gotten gains and avoided losses.  The Plan Administrator respectfully requests that the Court deny Jane Street's motion to dismiss. [14]

---

[14]   The Plan Administrator asserted alternative claims under the Commodity Exchange Act (Counts 10-15).  Notwithstanding its "reservation of rights," Jane Street effectively concedes that the Exchange Act applies to UST and LUNA.  MTD.24 n.11.  Courts have uniformly held that UST and LUNA are "securities" under the Exchange Act, and the SEC's recent guidance—issued after the Plan Administrator filed the complaint—further confirms that the Exchange Act applies here.  Given these developments, the Plan Administrator respectfully requests that the Court permit the Plan Administrator to withdraw the Commodity Exchange Act claims without prejudice to renewing them if UST or LUNA are determined not to be "securities" under the Exchange Act.

Dated: June 11, 2026

Respectfully submitted,

*/s/ John P. Del Monaco*

John P. Del Monaco
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
john_delmonaco@kirkland.com

Michael F. Williams, P.C. (*pro hac vice*)
Judson Brown, P.C. (*pro hac vice*)
Sarah E. McVay (*pro hac vice*)
Caroline Milner (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200
mwilliams@kirkland.com
jdbrown@kirkland.com
sarah.mcvay@kirkland.com
caroline.milner@kirkland.com

Casey J. McGushin (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
casey.mcgushin@kirkland.com

Sara Shaw Tatum
KIRKLAND & ELLIS LLP
830 Brickell Plaza
Miami, FL 33131
Telephone: (305) 432-5600
Facsimile: (305) 432-5601
sara.tatum@kirkland.com

*Counsel for Plaintiff Todd R. Snyder, as Plan Administrator for the Terraform Labs Pte. Ltd., et al., each Post-Effective Date Debtor, and the Wind Down Trust*

31

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send e-mail notification of this filing to all counsel of record.

/s/ *John P. Del Monaco*
John P. Del Monaco